2013 COA 111

**Jeff CHOSTNER, in his official capacity as District Attorney for the Tenth Judicial District, Colorado; Office of the District Attorney for the Tenth Judicial District, Colorado; and Rocky Mountain Environment and Labor Coalition, Plaintiffs–Appellees,**

**v.**

**COLORADO WATER QUALITY CONTROL COMMISSION; Steven H. Gunderson, in his official capacity as the Director of the Colorado Water Quality Control Division of the Colorado Department of Public Health and Environment; and Colorado Springs Utilities, Defendants–Appellants.**

**Court of Appeals Nos. 12CA1116 & 12CA1117**

Colorado Court of Appeals, Div. II.

Announced July 18, 2013

John Barth, Hygiene, Colorado, for Plaintiffs–Appellees

John W. Suthers, Attorney General, Jerry W. Goad, First Assistant Attorney General, Annette M. Quill, Senior Assistant Attorney General, Denver, Colorado, for Defendants–Appellants Colorado Water Quality Control Commission and Steven H. Gunderson

Hill & Robbins, P.C., David W. Robbins, Jennifer H. Hunt, Nathan P. Flynn, Denver, Colorado, for Defendant–Appellant Colorado Springs Utilities

Opinion by JUDGE DUNN

¶ 1 The regulation of water quality in Colorado is the domain of the Colorado Water Quality Control Commission (Commission) and the Water Quality Control Division (Division).

¶ 2 These consolidated appeals arise from a decision of the Division to conditionally certify a municipal water delivery project under section 401 of the federal Clean Water Act, 33 U.S.C. § 1341(a)(1) (2006). The District Attorney for the Tenth Judicial District, the Office of the District Attorney for the Tenth Judicial District, and the Rocky Mountain Environment and Labor Coalition (collectively, the Coalition) appealed the Division's 401 certification to the Commission.[1]

¶ 3 The Commission affirmed the Division's conditional certification. The Coalition then appealed the Commission's decision to the district court. The district court reversed the Commission's final agency action.

¶ 4 The Commission; Steven H. Gunderson, in his official capacity as the Director of the Division; and Colorado Springs Utilities (Colorado Springs), appeal the district court's judgment.[2] We reverse.

## I. Background

### A. The Southern Delivery System

¶ 5 The Southern Delivery System (SDS) is a municipal water delivery project involving the construction of a fifty-three-mile pipeline. The pipeline will transport raw water from the Pueblo Reservoir, through Pueblo County, and into El Paso County. The SDS also involves modifying an existing

1. During the pendency of this appeal, Jeff Chostner replaced Bill Thiebaut as the District Attorney for the Tenth Judicial District. Accordingly, Chostner, in his official capacity, is substituted as a party to this appeal. *See* C.A.R. 43(c)(1).

2. Unless otherwise noted, we will refer to the contentions of Mr. Gunderson and the Commission together as the Commission's contentions.

ditch and constructing the Upper and Lower Williams Creek Reservoirs. The SDS is intended to provide a reliable, future water supply to the City of Colorado Springs, the City of Fountain, the Security Water District, and the Pueblo West Metropolitan District. Given its scope and magnitude, the SDS is the most expansive project reviewed by the Division in several decades.

¶ 6 The SDS is expected to impact the Arkansas River from below the Pueblo Reservoir to an area near the confluence with the Apishapa River. The project is also expected to impact Fountain Creek from the City of Colorado Springs to the confluence with the Arkansas River at Pueblo.[3] Possible long-term impacts are predicted to result from changing stream flows. In addition, possible groundwater impacts may result from the construction of the Lower Williams Creek Reservoir. Impacts from the construction phase of the SDS, however, are expected to be minimal and short-term.

### B. Environmental Reviews

¶ 7 Because operation of the SDS involves federal contracts with the United States Bureau of Reclamation (Bureau), the project was required to go through an extensive environmental review, including analysis of potential water quality impacts, under the National Environmental Policy Act (NEPA). During its NEPA review, the Bureau conducted water quality analyses, received nearly 400 public comments on a variety of topics, imposed numerous mitigation measures and conditions on the SDS, and required the participants to develop adaptive management practices. The Bureau conducted its review over a five-year period, resulting first in a draft environmental impact statement. After receiving comments from the United States Environmental Protection Agency (EPA), in which the EPA indicated concerns about the configuration of the SDS and a lack of mitigation commitments to offset potential water quality impacts, the Bureau requested changes to the SDS configuration and then issued a supplemental information report. That report analyzed the changed configuration and incorporated a revised water quality assessment methodology suggested by the EPA.

¶ 8 As part of its review, the Bureau considered seven different alternatives for supplying the participant communities' future water needs, including the SDS. Of the alternatives studied, six were "action" alternatives and one was a "no action" alternative. The latter served "as a benchmark against which effects of the other alternatives [were] compared." The no action alternative represented the most likely future action in the absence of a major federal water development project.

¶ 9 After reviewing the seven alternatives, the Bureau ultimately identified the SDS as the "environmentally preferred alternative" because, in comparison to the other six alternatives, it would cause "the least damage to the biological and physical environment." After the Bureau published its final environmental impact statement, the EPA stated that it was "satisfied with the detailed mitigation commitments ... to offset the water quality impacts that are projected to result from [the] SDS."

¶ 10 A record of decision documented the Bureau's entire NEPA review process.

### C. Permitting

¶ 11 In order to construct the SDS, Colorado Springs was required to obtain many federal, state, and local permits. Included among the required permits was a dredge and fill permit from the Army Corps of Engineers under section 404 of the Clean Water Act, 33 U.S.C. § 1344 (2006). In order to obtain a section 404 permit, however, Colorado Springs needed a certification from the state under section 401 of the Clean Water Act. The 401 certification constitutes the state's finding that there is a reasonable assurance that the activity will be conducted in a manner which will not violate applicable water quality standards. *See* 33 U.S.C. § 1341(a)(1); 40 C.F.R. § 121.2(a)(3) (2012).

3. The Division concluded that the specific river segments with potential long-term impacts are: Middle Arkansas River segments 2 and 3, Lower Arkansas River segments 1a and 1b, and Fountain Creek segments 2a and 2b.

D. The Section 401 Certification Process

¶ 12 Colorado Springs—on behalf of all of the SDS participants—submitted an application to the Division, seeking a 401 certification. The Division issued a preliminary determination, concluding that the SDS could cause "potential long-term water quality impacts associated with flow changes" in the Arkansas River. In conjunction with this preliminary determination, the Division solicited public comments regarding the SDS.

¶ 13 The Division reviewed the public comments, including those submitted by the Coalition. It requested that Colorado Springs address issues raised by the public comments. The Division then engaged in a yearlong review of the project. Specifically, the Division conducted antidegradation reviews of certain reviewable stream segments, and considered a host of conditions and mitigation requirements imposed on the project by federal, state, and local agencies. In particular, the Division analyzed the Bureau's final environmental impact statement, record of decision, and associated reference materials; Pueblo County's mitigation requirements; and other agencies' mitigation plans.

¶ 14 The Division ultimately concluded that, given the short-term impacts of the construction activities, and the numerous conditions and mitigation measures imposed by other agencies, "the project [would] comply with all applicable provisions [of] the Basic Standards for Surface Waters, the Basic Standards for Ground Water, surface and ground water classifications and water quality standards, effluent limitations[,] and control regulations." Accordingly, the Division conditionally certified the SDS under section 401 of the Clean Water Act.

¶ 15 The 401 certification specifically imposed a number of conditions on the SDS, including (1) the development of an adaptive management program, (2) all conditions "placed on the SDS ... by other applicable regulatory agencies," (3) flow maintenance plans to minimize water quality impacts due to potential reduced flows in the Arkansas River, and (4) the installation of groundwater monitoring wells both up and downstream of the new Williams Creek Reservoirs. The certification also requires water quality sampling and data collection, as well as reporting measures.

¶ 16 After the Division issued its conditional 401 certification, the Army Corps of Engineers issued the section 404 dredge and fill permit, incorporating all of the Division's conditions as enforceable provisions of the section 404 permit.

E. The Administrative Appeal

¶ 17 The Coalition appealed the Division's 401 certification to the Commission. At an adjudicatory hearing, the Coalition asserted that the Division's certification was arbitrary, not in accord with its own procedures, unsupported by the record, and otherwise contrary to law.

¶ 18 After the hearing, the Commission issued a written order affirming the Division's 401 certification. The Commission found that the Coalition "ha[d] not met [its] burden to prove that the Division's conditional ... 401 certification for the SDS ... does not meet the federal standard of providing 'reasonable assurance' that the activity will be conducted in a manner which will not violate applicable water quality standards."

F. Judicial Review

¶ 19 The Coalition sought judicial review of the Commission's final agency action under section 24-4-106(4), C.R.S.2012. After the parties submitted briefing, the district court invited each side to submit a proposed order. The district court adopted the Coalition's proposed order nearly verbatim. In doing so, it reversed the Commission's order, finding that the Division's "401 certification/ antidegradation determination" was arbitrary, capricious, and failed to comply with the law. Specifically, the district court identified the following errors or omissions:

1. The Division failed to comply with public notice requirements in violation of Commission Regulations 82.5 and 21.16;
2. The Division failed to conduct antidegradation reviews of the relevant watershed segments in violation of Commission Regulation 31.8(3), and failed to present substantial evidence to support its determination that the SDS "will not cause

significant degradation of water quality and that water quality standards will be met";

3. The methodologies used by the Division in making its determinations were arbitrary and capricious;
4. The Division's certification would illegally allow additional degradation of impaired stream segments by failing to establish total maximum daily loads for those segments; and
5. The Division failed to assess the impacts of population growth on water quality.

¶ 20 Colorado Springs and the Commission appeal this judgment.

## II. District Attorney Standing

¶ 21 As a preliminary matter, Colorado Springs asks us to find that the District Attorney and the Office of the District Attorney for the Tenth Judicial District (collectively, the District Attorney) do not have standing to challenge the final agency action of the Commission. We decline to address the question.

¶ 22 The Commission granted the Coalition party status. *See* § 24–4–105(2)(c), C.R.S. 2012 (requiring agencies to grant party status, upon request, to persons "who may be affected or aggrieved by agency action"). Thus, the parties do not dispute that the Coalition possessed standing to challenge the Commission's actions. Given that the Coalition and the District Attorney assert identical arguments on appeal, we need not reach the issue of whether the District Attorney has standing independent of the Coalition. *See Lobato v. State,* 218 P.3d 358, 368 (Colo. 2009); *accord In re Title for 1999–2000 No. 215,* 3 P.3d 11, 14 (Colo.2000) (declining to address standing of one party where other party had standing and parties presented identical arguments).

## III. Standard of Review

¶ 23 On appeal from the district court's review of the Commission's final agency action, this court applies the same standard of review as the district court. *Schlapp v. Colo. Dep't of Health Care Policy & Fin.,* 2012 COA 105, ¶ 9, 284 P.3d 177; *see also* § 24–4–106(7), (11)(e), C.R.S.2012. That standard dictates that the Commission's final agency decision may not be reversed unless it is arbitrary and capricious or contrary to rule or law. § 24–4–106(7); *Rigmaiden v. Colo. Dep't of Health Care Policy & Fin.,* 155 P.3d 498, 501 (Colo.App.2006). The Commission's decision must be sustained if it has a reasonable basis in law and is supported by substantial evidence in the administrative record. *E.R. Southtech, Ltd. v. Arapahoe Cnty. Bd. of Equalization,* 972 P.2d 1057, 1059 (Colo.App.1998). Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *C Bar H, Inc. v. Bd. of Health,* 56 P.3d 1189, 1192 (Colo.App.2002).

¶ 24 In evaluating administrative decisions, we recognize that "the primary responsibility for the function under review lies in the administrative agency and not in the courts." *Wildwood Child & Adult Care Program, Inc. v. Colo. Dep't of Pub. Health & Env't,* 985 P.2d 654, 655 (Colo.App.1999) (quoting *Bennett v. Price,* 167 Colo. 168, 173, 446 P.2d 419, 421 (1968)). Thus, the administrative agency, and not the reviewing court, has the task of weighing the evidence and resolving any conflicts. *Bd. of Assessment Appeals v. Colo. Arlberg Club,* 762 P.2d 146, 151 (Colo.1988); *see also* § 24–4–106(7). And although we are not bound by an agency decision that misapplies or misconstrues the law, we defer to an agency's interpretation of the statute or regulation it is charged with administering. *El Paso Cnty. Bd. of Equalization v. Craddock,* 850 P.2d 702, 705 (Colo.1993). In this regard, "[a]dministrative interpretations are most useful to the court when the subject involved calls for the exercise of technical expertise which the agency possesses and when the statutory language is susceptible to more than one reasonable interpretation." *Id.*

¶ 25 We presume the validity and regularity of administrative proceedings, and all reasonable doubts as to the correctness of administrative rulings must be resolved in favor of the agency. *Wildwood,* 985 P.2d at 655. The burden is on the party challenging the agency action to overcome the presumption that the agency's acts were proper. *Id.*

¶ 26 Finally, where, as here, a district court adopts an order drafted by counsel, we scrutinize the order more critically. *See Uptime Corp. v. Colo. Research Corp.*, 161 Colo. 87, 93–94, 420 P.2d 232, 235 (1966) ("Where the findings of the trial court are verbatim those submitted by the successful litigant, we will ... scrutinize them more critically and give them less weight than if they were the work product of the [trial court].").

## IV. The District Court's Review of the Commission's Decision

¶ 27 Colorado Springs and the Commission contend that the district court misapplied the relevant standard of review. We agree.

¶ 28 In its order reversing the Commission's decision, the district court noted that it had "previously presided over condemnation cases involving the SDS" and had "found [in those cases] that the City of Colorado Springs did not deal fairly with Pueblo landowners." The court further stated that, in the condemnation proceedings, it had "found that the City had failed to negotiate in good faith." The court concluded, albeit impliedly, that based on its findings in the condemnation proceedings, it could not credit the reliance placed by the Commission and Colorado Springs "on documentation which discuss[ed] future mitigation based upon a spirit of cooperation."

¶ 29 Judicial review of an administrative agency determination is limited to the record before the agency. *Anderson v. Colo. State Dep't of Pers.*, 756 P.2d 969, 978 (Colo. 1988); *see* § 24–4–106(6), C.R.S.2012. Here, the administrative record does not contain any evidence regarding the prior condemnation cases. Moreover, the Commission—not the district court—is tasked with determining the weight and credibility of the evidence. *Colo. Arlberg Club*, 762 P.2d at 151. Thus, it was for the Commission to determine the weight and impact of any proposed future mitigation efforts agreed to by the SDS participants. Accordingly, the district court erred to the extent that it reweighed the evidence and made credibility determinations based on information outside the administrative record.

## V. The Division's Public Notice

¶ 30 Colorado Springs and the Commission next contend that the district court erred in rejecting the Commission's finding that the Division complied with the public notice requirements set forth in the Commission's regulations. We agree.

### A. The Public Notice Rulings

¶ 31 In addressing deficiencies raised by the Coalition regarding the Division's preliminary and final public notices, the Commission found:

1. The Division was not required by the public notice provisions of Commission Regulation 82 to identify Wildhorse Creek in its public notices;
2. The Division's omission of Lower Arkansas segment 1b was proper because the Division appropriately determined that the SDS would not cause measurable water quality impacts to this segment; and
3. The Division's failure to include in its final public notice a statement that no significant degradation of water quality would occur on the Arkansas River and Fountain Creek as a result of the SDS and that applicable water quality standards would be met, was harmless.

¶ 32 The district court disagreed with the Commission and found that the Division's public notices were deficient.

### B. The Public Notice Regulation

¶ 33 The regulation governing public notice of section 401 certifications requires the Division to provide public notice of its (1) preliminary antidegradation determination, if applicable; (2) draft certification determination; and (3) final antidegradation and certification determinations. Water Quality Control Comm'n Reg. 82.5(B)(1), (2), 5 Code Colo. Regs. 1002 (Comm'n Regs.). The notices must be placed in the Division's Water Quality Information Bulletin. *Id.* With respect to the Division's preliminary antidegradation determination, the notice must include, among other things, an "[i]dentification of

the stream segment, river basin, and county in which the proposed activity is located." Comm'n Reg. 21.16(B)(2)(c). However, the notice requirements for antidegradation review apply only to activities with new or increased water quality impacts that may degrade the quality of "reviewable" waters subject to antidegradation review. Comm'n Reg. 21.16(B). The notice requirements do not apply to waters that are classified as "use-protected." *See* Comm'n Reg. 31.8(1)(c) (antidegradation review requirements are not applicable to waters designated as use-protected).

C. Analysis

¶ 34 There is no dispute that the Division published its draft and final notices of section 401 certification in its Water Quality Information Bulletin. The dispute, rather, centers on whether (1) the Division should have identified certain stream segments in the notices, and (2) the notices provided the required information.

1. Wildhorse Creek

¶ 35 The record reflects that Wildhorse Creek is classified as "use-protected." It is, therefore, not subject to antidegradation review, and the antidegradation notice provisions do not apply. *See* Comm'n Regs. 21.16(B), 31.8(1)(c), (3)(a) (use-protected waters are not "reviewable waters"). Thus, the plain language of the regulation supports the Commission's determination that Wildhorse Creek did not need to be included in the public notice of the Division's antidegradation review determination. *See* Comm'n Reg. 82.5(B)(1) (draft certification shall contain preliminary degradation determination, "if applicable").

¶ 36 To the extent the Coalition argues that the Division's draft 401 certification determination "failed to provide public notice that there would be water quality impacts to Wildhorse Creek," we perceive no error. Wildhorse Creek is also known as Middle Arkansas segment 4a, and the Division's draft 401 certification determination identified the Middle and Lower Arkansas subbasins as the impacted water basin. While the Division was free to, and in some instances did, provide more specificity in its draft certification determination, *nothing in* Commission Regulation 82.5(B) expressly required it to do so.

2. Lower Arkansas Segment 1b

¶ 37 For similar reasons, we conclude that the Commission did not err in determining that the Division appropriately excluded Lower Arkansas segment 1b from its public notices. The record demonstrates that Lower Arkansas segment 1b is also classified as use-protected and thus is not subject to antidegradation review. *See* Comm'n Regs. 21.16(B), 31.8(1)(c), (3)(a). In addition, Lower Arkansas segment 1b is in the identified Lower Arkansas sub-basin.

¶ 38 Further, John Hranac, the Division employee responsible for the SDS 401 certification review, testified that the area surrounding Lower Arkansas segment 1b is intensively farmed, and has many agricultural return flows and other tributaries. He also testified that, given this fact, "the water quality [of that segment] was attenuated to a degree that [the Division] wouldn't be able to discern SDS impacts." No contrary evidence was presented to rebut this testimony and the Commission was entitled to rely on it. Thus, the evidence supports the Commission's conclusion that the Division appropriately determined that the SDS "[would] not cause measurable water quality impacts to this segment."

3. Middle Arkansas Segments 2 and 3

¶ 39 We agree with Colorado Springs and the Commission that the district court erred in addressing the Coalition's argument that the Division violated public notice requirements by failing to identify Middle Arkansas segments 2 and 3 in its initial public notice. This argument was not made before the Commission and was therefore not properly preserved for review. *People ex rel. Woodard v. Brown,* 770 P.2d 1373, 1375 (Colo.App.1989) (contentions not raised or addressed in administrative proceedings should not be considered on appeal).

4. Content of Notices: Harmless Error

¶ 40 Finally, the Coalition did not demonstrate any prejudice related to its perceived deficiencies in the content of the final public notice. Contrary to the Coalition's assertion, any error in the Division's failure to (1) specifically articulate its final antidegradation determination, or (2) include changes that the Division made following the public comment period, was harmless.

¶ 41 The administrative record reflects that the Coalition received notice of the Division's preliminary section 401 certification and antidegradation determination and that it submitted comments in response to the notice. The record also shows that the Coalition received actual notice of the Division's final certification and antidegradation determinations, which included the Division's responses to public comment, prior to issuance of the final public notice.

¶ 42 All of the Division's determinations were provided to the Coalition, among others. Thus, we conclude that the Division's error, if any, in failing to include in its final public notice specific antidegradation language or information about changes it made to its section 401 certification based upon public comment, was harmless. *See Wunder v. Dep't of Revenue,* 867 P.2d 178, 181 (Colo. App.1993) (an agency's nonjurisdictional statutory violation constitutes only harmless error absent a showing of actual prejudice to a party's substantial rights).

¶ 43 In sum, we conclude that there is substantial evidence in the administrative record to support the Commission's conclusion that the public notices were sufficient. *See E.R. Southtech, Ltd.,* 972 P.2d at 1059 (an agency's decision must be sustained if it has a reasonable basis in law and is supported by substantial evidence in the administrative record).

VI. The Division's Analyses of "Reviewable" Waters

¶ 44 Colorado Springs and the Commission contend that, contrary to the district court's determinations, (1) the Division's antidegradation determinations are supported by substantial evidence in the record, and (2) the Division appropriately interpreted and applied the regulations and guidance governing the methodologies for antidegradation analyses. Thus, they argue, the Commission's findings on these issues were neither arbitrary and capricious nor contrary to rule or law. We agree.

A. The Division's Antidegradation Reviews Are Supported by Substantial Evidence

¶ 45 In determining whether to issue a 401 certification, the Division considers, as appropriate, a number of factors, including antidegradation reviews. *See* Comm'n Reg. 82.5(A)(1)(a). Antidegradation reviews apply to "regulated activities with new or increased water quality impacts that may degrade the quality of state surface waters that have not been designated as outstanding waters or use-protected waters." Comm'n Reg. 31.8(3)(a).

¶ 46 There is no dispute that the SDS is a "regulated activity" within the meaning of the regulations. And there is no dispute that the following four stream segments were subject to antidegradation review in the SDS certification process: Fountain Creek segments 2a and 2b, and Middle Arkansas segments 2 and 3.[4]

¶ 47 Evidence was presented to the Commission that the Division conducted antidegradation reviews on the four reviewable stream segments in connection with its section 401 certification. Specifically, Hranac testified that he conducted an antidegradation review on the reviewable segments. In addition, he testified that, in conducting the reviews, the Division looked at the information that was generated from the Bureau's final environmental impact statement, information contained in the Division's own data library, and the mitigation conditions imposed by various federal and state agencies.

4. Although Colorado Springs and the Commission identify a fifth reviewable stream segment, Fountain Creek segment 4, a joint demonstrative exhibit introduced at the Commission hearing identifies that segment as use-protected, and therefore, not subject to antidegradation review. *See* Comm'n Reg. 31.8(3)(a); *see also* Comm'n Reg. 32.6 (Classifications and Numeric Standards for Arkansas River Basin) (identifying Fountain Creek segment 4 as use-protected).

He further testified that the review was not memorialized in writing because he was not "aware of any requirement that an [antidegradation] review be in writing."

¶ 48 The district court, however, found that the Division failed to "conduct" antidegradation reviews of the relevant stream segments, apparently because the antidegradation reviews were not in writing. Contrary to the district court's finding, we see nothing in the Commission's regulations that expressly requires the Division to perform written antidegradation reviews. Lacking any regulation requiring written antidegradation reviews, we defer to the Commission's interpretation of its regulations. *See Schlapp,* ¶ 9 ("When the agency's existing interpretation of its promulgated regulations and enabling legislation is reasonable and not contrary to law, we will defer to that interpretation.").

¶ 49 Finally, we note that the Division's "401 Water Quality Certification Rationale" memorializes the fact that the Division conducted antidegradation reviews of the reviewable stream segments. This written document identifies, among other water bodies, the reviewable stream segments, and contains a completed section reflecting the Division's antidegradation review for the reviewable segments.

¶ 50 Accordingly, there is substantial evidence in the administrative record that the Division conducted antidegradation reviews. Consequently, the district court erred in finding that the Division failed to conduct antidegradation reviews of the reviewable stream segments.

### B. The Division's Antidegradation Methodology Is Supported by Substantial Evidence

¶ 51 The administrative record demonstrates that there was a reasonable basis for the Division's methodology in conducting its antidegradation reviews. Thus, we conclude that the Commission did not err in affirming that methodology.

#### 1. Antidegradation Regulations

¶ 52 The "initial step in an antidegradation review [is] a determination [of] whether the regulated activity in question is likely to result in significant degradation of reviewable waters, with respect to adopted narrative or numeric standards." Comm'n Reg. 1002–31.8(3)(c). This determination is known as a significance determination. *Id.* In making this determination, the Division considers the "net effect" of the new or increased water quality impacts of the proposed activity, including (1) environmental benefits, (2) water quality enhancements, and (3) mitigation measures incorporated into the activity. *Id.* For pollutants, Commission Regulation 31.8 includes an additional quantitative test, known as a concentration test. *See* Comm'n Reg. 31.8(3)(c)(ii). Under this test, a finding of no significant degradation is mandated so long as the regulated activity "will consume, after mixing, less than 15 percent of the baseline available increment." Comm'n Reg. 31.8(3)(c)(ii)(B).[5]

#### 2. Pertinent Administrative Events

¶ 53 At the Commission hearing, the Division submitted the written testimony of Hranac, who conducted the antidegradation reviews. In this testimony, Hranac stated that, after conducting the significance determination, his preliminary conclusion was that the SDS "may cause potential long-term water quality impacts due to flow changes" in some of the reviewable stream segments. His written testimony then outlines the review he conducted over several months following the significance determination to assess water quality impacts.

¶ 54 In particular, Hranac explained that he conducted a detailed review of Colorado Springs's application and supporting materials, including the voluminous materials prepared in response to other state and federal agency requirements. In doing so, he relied upon the Bureau's conclusion that the SDS was the "environmentally preferred alternative" of the seven alternatives considered and

5. The baseline available increment is "the increment between low-flow pollutant concentrations and the relevant standards for critical constituents for that portion of the segment impacted by the discharge." Comm'n Reg. 31.8(3)(c)(ii)(B).

reviewed. He also reviewed the numerous permit conditions and mitigation plans imposed on the SDS by various state and federal agencies. Based on this review and using his experience and professional judgment, he concluded that the SDS will not result in significant degradation of the reviewable stream segments.

¶ 55 Hranac presented additional live testimony before the Commission. He reiterated that the Division reviewed the water quality data and assessment methodology in the Bureau's final environmental impact statement along with the Division's water quality data in reaching its own conclusions regarding potential water quality impacts from the SDS.

¶ 56 With respect to the Division's ability to conduct a quantitative review of the SDS, Hranac stated in his written testimony that because the SDS does not involve any point source discharges, he "could not effectively use the quantitative analysis provisions" set forth in the internal guidance document used by the Division to conduct antidegradation significance determinations. At the hearing, Hranac again testified that "the quantitative aspects of antidegradation review" were not "appropriate" in analyzing the SDS impacts on water quality. He reiterated that, because the SDS does not involve a point source discharge, the Division could not rely on the quantitative screening aspects of its internal antidegradation guidance document.

¶ 57 Another Division employee, Sarah Johnson, also testified that the antidegradation reviews for section 401 certifications are "typically qualitative" and "focus on minimizing the sediment delivery." [6]

¶ 58 The Coalition cross-examined both Johnson and Hranac, but it did not present any independent testimony, expert or otherwise, showing that a qualitative analysis is inappropriate for a project that does not involve a discharge from a point source. Nor did it present any witnesses to counter the Division's conclusion that it may apply a qualitative analysis for projects, such as the SDS, not involving the discharge of pollutants from a point source. Rather, the Coalition argued that the regulations and antidegradation guidance require a quantitative analysis for section 401 certifications, even in the absence of a point source discharge.

¶ 59 After considering the testimony and evidence presented, the Commission concluded that the Division "accurately characterized" the SDS's water quality impacts and that the Division reviewed proper materials in reaching its conclusions regarding potential water quality impacts from the SDS. The Commission rejected the contention that a quantitative antidegradation review was required for the SDS. In so doing, the Commission noted that certain quantitative procedures set forth in the antidegradation guidance document were "developed to address projects that involve a point source discharge of pollutants." The Commission further concluded that because the operation of the SDS does not involve the discharge of pollutants from a point source, "the quantitative analysis could not be effectively used and was not appropriate" to evaluate the water quality impacts of the SDS.

### 3. The District Court's Conclusions

¶ 60 The district court concluded that the methodology used by the Division, and affirmed by the Commission, was arbitrary and capricious. Specifically, the district court concluded that the Division erred in failing to "calculate" a quantitative significance determination. The court then substituted its own analysis, based on predicted water quality impacts, and concluded that the concentration threshold of fifteen percent would be exceeded in various stream segments as a result of the operation of the SDS.

### 4. Analysis

¶ 61 We do not agree that the Commission acted in an arbitrary or capricious manner or contrary to law. Rather, our review of the administrative record establishes that it supports the Commission's findings.

6. Johnson testified that antidegradation reviews are also performed for projects involving pollutant discharge permits. No evidence was presented that the operation of the SDS will result in the discharge of any pollutant from a point source.

¶ 62 First, the Commission's regulation regarding 401 certifications states that "the 401 certification process should be coordinated or consolidated with the scoping and review processes of other agencies which have a role in a proposed project in an effort to minimize costs and delays for such projects." Comm'n Reg. 82.5(C)(2). Thus, we conclude that it was reasonable for the Division to rely on its interpretation of the Bureau's comprehensive NEPA review, which included extensive water quality analyses.

¶ 63 Second, Commission Regulation 82.5 expressly directs the Division to consider and review, among other things, antidegradation reviews and water quality standards "as appropriate." Comm'n Reg. 82.5(A)(1)(a), (c). This language grants the Division broad discretion to consider and review those materials that it deems relevant and necessary to make its section 401 determination regarding water quality impacts. It further permits the Division flexibility based on the circumstances presented. *See Consumer Fed'n v. U.S. Dep't of Health & Human Servs.*, 83 F.3d 1497, 1503 (D.C.Cir. 1996) (in an administrative context, where the word "shall" is modified by the phrase "as appropriate," an agency has discretion as to the manner in which it considers regulatory mandates). Nothing in the section 401 certification regulation confines the Division's discretion regarding the methodologies to be used in section 401 certifications. And given the predictive nature of section 401 certifications, there is no basis to conclude that a qualitative analysis is arbitrary or capricious in the context presented here. *See Port of Seattle v. Pollution Control Hearings Bd.*, 151 Wash.2d 568, 90 P.3d 659, 676 (2004) ("[T]he 'reasonable assurance' standard does not require absolute certainty. The inherent predictive nature of a § 401 certification cannot be avoided; each § 401 certification must address future events and the likelihood that those events will result in violations of water quality standards.").[7]

¶ 64 The Commission's antidegradation regulation also contemplates that, in conducting antidegradation reviews, the Division shall make its significance determination with respect to the "net effect" of the water quality impacts from the proposed activity, "taking into account any environmental benefits resulting from the regulated activity and any water quality enhancement or mitigation measures ... if such measures are incorporated with the proposed regulated activity." Comm'n Reg. 31.8(3)(c). This broad language again leaves to the discretion and expertise of the Division the determination of which specific tasks and methodologies are appropriate in conducting its review. While the antidegradation regulation does contemplate a quantitative significance determination in some cases, it does not expressly preclude a qualitative analysis in circumstances other than projects involving pollutant discharges from point sources. And here, the Commission determined that operation of the SDS does not involve a point source pollutant discharge. Thus, it was reasonable for the Commission to conclude that a quantitative approach to antidegradation was not appropriate for the SDS. *Cf. Colo. Wild, Inc. v. U.S. Forest Serv.*, 122 F.Supp.2d 1190, 1192 (D.Colo.2000) ("[W]ater quality impacts arising from the diversion of water rather than the discharge of pollutants does not implicate Colorado water quality statutes.").

¶ 65 Likewise, the Division's antidegradation guidance document recognizes the need for flexibility in conducting antidegradation reviews. To this end, it plainly states that "unique situations will be assessed on a case-by-case basis, using site-specific data and methodology." It further recognizes that section 401 certifications—as opposed to pollutant discharge permits—"most often focus upon the protection of narrative standards." And typically, "qualitative judgments are required to determine whether ... narrative water-quality standards are met." *In re 401 Water Quality Certification*, 822 N.W.2d 676, 686 (Minn.Ct.App.2012).

¶ 66 Because the Commission is the agency tasked with administrative review of section

7. The Bureau recognized, in its final environmental impact statement, that quantitative results are best used to compare the effects of the seven proposed alternatives, "rather than as a prediction of likely future conditions."

401 certifications, and given the technical nature of this review, we defer to the Commission's interpretations of its regulations. *See Craddock,* 850 P.2d at 705; *see also Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 361, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (where analysis of the information requires a high degree of technical expertise, courts must defer to the informed discretion of the responsible agency); *Water Quality Certification,* 822 N.W.2d at 688 (where the subject matter of a regulation is within the agency's technical training, education, and experience, courts should defer to the agency's expertise and special knowledge as long as the agency's interpretation of the regulation is reasonable).

¶ 67 The Commission's interpretive conclusions here are neither unreasonable nor plainly erroneous or inconsistent with the 401 certification or antidegradation regulations. *See, e.g., Van Pelt v. State Bd. for Cmty. Colls. &* Occupational Educ., 195 Colo. 316, 323, 577 P.2d 765, 770 (1978); *see also Port of Seattle,* 90 P.3d at 670 (in context of a section 401 certification, "[w]here there is room for two opinions, and the agency acted honestly and upon due consideration," court should not find that an action was arbitrary and capricious). Accordingly, we do not agree that the Commission's interpretation of its regulations was arbitrary, capricious, or contrary to law.

¶ 68 In addition, although the district court disagreed with the conclusions drawn from the evidence presented and appeared not to credit Hranac's testimony, it is not the prerogative of the reviewing court to reweigh the evidence. *See Microsemi Corp. v. Broomfield Cnty. Bd. of Equalization,* 200 P.3d 1123, 1125 (Colo.App.2008). It is for the Commission to resolve any conflicts in testimony and to weigh the evidence presented. § 24–4–106(7); *Charnes v. Lobato,* 743 P.2d 27, 33 (Colo.1987) ("[W]hen conflicting evidence is offered[,] it is the agency's role, not the role of the reviewing court, to assess credibility and weigh testimony and other evidence."). To that end, it does not matter whether the district court, or this court, prefers a methodology other than the one approved by the Commission. It is not the role of the reviewing courts to choose among alternative methodologies. That is the function of the Commission. Rather, the role of reviewing courts is limited to determining whether the Commission's decision is consistent with its regulations and supported by the record.

¶ 69 There is substantial uncontroverted evidence in the administrative record supporting the Division's application of a qualitative analysis in the context of a project, such as the SDS, that does not involve the discharge of pollutants from a point source. Thus, the Commission acted reasonably and its decision should be affirmed. *See Colo. Dep't of Human Servs. v. Maggard,* 248 P.3d 708, 712 (Colo.2011) (reviewing court may not reverse agency decision where there is sufficient evidence supporting decision); *E.R. Southtech,* 972 P.2d at 1059 (agency determination must be sustained if it has a reasonable basis in law and is supported by substantial evidence in the record as a whole).

¶ 70 Accordingly, we conclude that the district court erred in determining that the methodology selected and applied by the Division, and affirmed by the Commission, was arbitrary and capricious.

## VII. Total Maximum Daily Loads (TMDLs)

¶ 71 Colorado Springs and the Commission contend that the district court erred as a matter of law in finding that federal law required the Division, as a prerequisite to issuing its 401 certification, to establish TMDLs for certain impaired stream segments. They argue, rather, that the Commission correctly concluded that the Division was not required to develop TMDLs for these segments before issuing its 401 certification. We agree.

### A. Applicable Law

¶ 72 The Clean Water Act requires all states to identify waters within their borders where pollution controls are not sufficient to attain or maintain water quality standards. *See* 33 U.S.C. § 1313 (d)(1)(A) (2006); *see also* Comm'n Reg. 93.2(1). States are also required to establish a priority ranking for such impaired waters and, in accordance with

the ranking, develop a TMDL for identified pollutants. 33 U.S.C. § 1313(d)(1)(C) (2006); *see* Comm'n Regs. 93.2(1), 93.3. The TMDL is the sum of the individual wasteload allocations for each point source discharging into the water body at issue and the load allocations for nonpoint sources and natural background. 40 C.F.R. § 130.2(i) (2012).

¶ 73 Federal regulations require TMDLs for permits seeking to discharge pollutants from any point source into the waters of the United States. 40 C.F.R. § 122.1(b)(1) (2012); *see* 33 U.S.C. § 1342(a)(1) (2006) (authorizing permits for the "discharge of pollutants"). Specifically, 40 C.F.R. § 122.4(i) (2012) prohibits such a permit from issuing "[t] o a new source or a new discharger, if the discharge from its construction or operation will cause or contribute to the violation of water quality standards."

B. Analysis

¶ 74 Section 401 certifications are distinct from the pollutant discharge permits discussed in 40 C.F.R. § 122.4(i). Section 122.4(i) governs only point source pollutant discharge permits. *See Friends of Pinto Creek v. U.S. E.P.A.*, 504 F.3d 1007, 1013 (9th Cir.2007) ("discharge" means the "discharge of a pollutant" from "any point source"); 40 C.F.R. § 122.4(i). Because the Division's 401 certification of the SDS does not involve issuance of a point source pollutant discharge permit, the Division was not required to develop a TMDL as a prerequisite to certification. Accordingly, the district court erred in concluding that a TMDL was required.

¶ 75 Nor does *Friends of Pinto Creek* dictate a contrary result. In that case, a mining company sought a pollutant point source discharge permit in order to discharge mining-related copper into *Pinto Creek*, 504 F.3d at 1009. The court held that the EPA could not issue the discharge permit until it complied with 40 C.F.R. 122.4(i)(2), which required a water quality compliance schedule before issuance of the permit. *Id.* at 1015. The case did not involve a section 401 certification. Accordingly, *Friends of Pinto Creek* does not support the district court's conclusion that a TMDL was required as a condition of the Division's section 401 certification.

VIII. Future Population Growth

¶ 76 Colorado Springs and the Commission contend that the district court erred in concluding that the Division was required to assess the potential impacts of future population growth as part of its section 401 review process for the SDS. We agree.

¶ 77 As an initial matter, we see nothing in the Commission's regulations that requires the Division to consider future population growth and development in conducting its section 401 review. Absent a statute or regulation specifically requiring such a review, we defer to the Commission's interpretation of its regulations. *See Schlapp*, ¶ 9.

¶ 78 Moreover, the Coalition did not present any evidence that the SDS will cause population growth. Rather, evidence was presented that growth will occur in the City of Colorado Springs regardless of whether the SDS is constructed. The program director for the SDS testified regarding the need to ensure a reliable source of water for existing and future areas of the City of Colorado Springs. He further testified that none of the analyses conducted considered the SDS to be a trigger for additional population growth. Likewise, the Bureau's record of decision concludes that "growth is not a direct or indirect effect of the proposed SDS."

¶ 79 Based on the evidence presented, the Commission concluded that "[p]opulation growth—and the resulting increase in wastewater and stormwater flows—is expected to occur regardless of whether the SDS is built." This finding is supported by substantial evidence in the record and is not arbitrary or capricious.

IX. Conclusion

¶ 80 There is substantial evidence in the record to support the Commission's conclusion that the Division's conditional section 401 certification meets the federal standard of providing reasonable assurance that the SDS will be conducted in a manner which will not violate applicable water quality stan-

dards. Accordingly, the judgment of the district court is reversed.

JUDGE CASEBOLT and JUDGE LICHTENSTEIN concur.