2014 COA 97

Anthonia IDOWU; Anne Steele; and Mary Whitfield, Plaintiffs–Appellants,

v.

Kathy NESBITT, in her official capacity as Executive Director of the Colorado Department of Personnel and Administration; Colorado Department of Personnel and Administration; and Colorado Department of Human Services, Defendants–Appellees.

Court of Appeals No. 13CA0801

Colorado Court of Appeals, Div. II.

Announced July 31, 2014

Schwane Law, LLC, Mark Schwane, Denver, Colorado, for Plaintiffs–Appellants

John W. Suthers, Attorney General, Tricia A. Leakey, Assistant Attorney General, Denver, Colorado, for Defendants–Appellees Kathy Nesbitt, and the Colorado Department of Personnel and Administration

John W. Suthers, Attorney General, Michelle Brissette Miller, First Assistant Attorney General, Denver, Colorado, for Defendant–Appellee Colorado Department of Human Services

Opinion by JUDGE DAILEY

¶ 1 In this dispute over the right to overtime compensation, plaintiffs, Anthonia Idowu, Anne Steele, and Mary Whitfield, appeal the district court's judgment upholding the decision of defendant, Kathy Nesbitt, in her official capacity as Executive Director of the Colorado Department of Personnel and Administration (the Director).

¶ 2 This case presents an issue of first impression in Colorado: Can a state agency retroactively cancel previously approved and

taken leave time to avoid having to pay "essential employees" overtime compensation pursuant to section 24–50–104.5(1), C.R.S. 2013?

¶ 3 Because we conclude that a state agency may not retroactively cancel previously approved and taken leave time of essential state employees, we reverse, in part, the district court's judgment and remand for further proceedings.

## I. Background

¶ 4 Idowu and Whitfield are employed as Health Care Tech IIIs at the Colorado State Veterans Nursing Home at Fitzsimons (Fitzsimons), a facility operated by the Colorado Department of Human Services (DHS) and providing skilled nursing, long-term care, and short-term rehabilitation services to veterans. Steele is also employed at Fitzsimons, but as a Nurse III.

¶ 5 Fitzsimons operates 24 hours a day, 7 days a week, for a 168-hour workweek.

¶ 6 Idowu, Whitfield, and Steele are designated as "essential" state employees providing support services for the personal care, feeding, safety, sanitation, and security of the residents at Fitzsimons. Section 24–50–104.5(1) provides that authorized paid leave time counts as work time for purposes of providing overtime compensation to "essential" state employees:

> Holidays and periods of authorized paid leave falling within a regularly scheduled workweek shall be counted as work time in determining overtime for employees performing essential law enforcement, highway maintenance, and other support services directly necessary for the health, safety, and welfare of patients, residents, and inmates of state institutions or state facilities.

¶ 7 Idowu, Whitfield, and Steele each received approval from their supervisors to take paid leave time which, when combined with their work time, totaled more than forty hours in the workweek:

- Idowu took eight hours of approved paid sick leave and worked for 39.5 hours, resulting in 47.5 total hours for one workweek;

- Whitfield took eight hours of approved paid sick leave and eight hours of paid education leave and worked for 25.75 hours, resulting in 41.75 total hours for one workweek; and

- Steele took eight hours of approved paid sick leave and worked for 33.75 hours, resulting in a total of 41.75 hours for one workweek.

¶ 8 Following the end of the relevant pay period, DHS, acting pursuant to a state personnel regulation allowing agencies to "deny, delay, or cancel leave" to reduce overtime liability, Dep't of Pers. Reg. 3–34, 4 Colo. Code Regs. 801–1 (2012), adjusted the employees' timesheets to reflect, in each instance, only forty hours of work for the week. It did so by subtracting 7.5 hours of authorized paid sick leave from Idowu's timesheet and 1.75 hours of authorized paid sick leave from each of Whitfield's and Steele's timesheets.[1]

¶ 9 Each employee grieved the alterations to her timesheet and requested to be paid at an overtime rate for "work time" that exceeded forty hours, arguing that, by canceling their authorized sick leave after they had taken it, Fitzsimons had violated section 24–50–104.5(1). The administrator of Fitzsimons denied Idowu's and Whitfield's grievances on the merits and Steele's grievance on the ground that it was untimely.

¶ 10 The three employees petitioned the State Personnel Board (the Board) for further review of their grievances. Ultimately, the grievances were reviewed by the Director, who is charged, among other things, with "provid[ing] necessary directives and oversight for the management of the state personnel system." § 24–50–101(3)(c), C.R.S. 2013. The Director upheld the denials of the three employees' grievances on the previously identified grounds.

---

1. The three employees did not perform any work at Fitzsimons while they were out on sick leave; and, Fitzsimons restored to their leave balances the sick hours which, though previously approved, were ultimately subtracted from their timesheets.

¶ 11 With respect to the merits of Idowu's and Whitfield's claims, the Director determined that

- she was authorized to "promulgate[ ] rules that provided necessary criteria and processes to administer the statute and applicable federal laws" based on her understanding of another provision in section 24–50104.5(1);
- pursuant to that authority, she promulgated Regulation 3–34;
- Regulation 3–34 permits agencies to cancel an essential employee's leave that has already been authorized; and,
- such a cancellation is proper, even after the end of the pay period in which the leave was taken, because "it is common for an appointing authority to make revisions to an employee's timesheet after the pay period or workweek has ended."

¶ 12 Pursuant to section 24–4–106(4), C.R.S.2013, the three employees sought judicial review by the district court, which upheld the Director's decision. With respect to the merits of Idowu's and Whitfield's claims, however, the court used somewhat different reasoning. According to the court:

- under section 24–50–104.5(1), paid leave counts toward the calculation of overtime hours if it is "authorized";
- the word "authorized" provides "employers the discretion of whether to grant leave for an employee when to do so would result in having to pay the employee time-and-a-half for hours that were not actually worked";
- the discretion under the statute to "authorize" leave time includes the discretion to withdraw, or "cancel," authorization of leave time after the end of the workweek;
- "[c]onstruing the statute in this way does not render it meaningless. State agencies are mandated to count holidays toward calculation of overtime, and they have the discretion to authorize leave that would likewise count toward this total. The statute, however, does not compel the appointing authority to do so."; and,

- the employees' contrary reading of the statute leads to an absurd result: An employee "could receive a grant of forty hours of leave for a given week and then work forty hours anyway."

## II. Steele's Grievance

¶ 13 Initially, we address and reject Steele's contention that her grievance should not have been denied on the ground that it was untimely asserted.

¶ 14 The state personnel director has promulgated procedures for the review of employee grievances. Under these regulations, a state employee has ten days to file a grievance from the point that the employee knows or reasonably should have known of the challenged agency action. Dep't of Pers. Reg. 8–8(A)(2), 4 Colo.Code Regs. 8011 (2012). If an employee is dissatisfied with the agency's resolution of the grievance, the employee may file a petition for hearing by the Board within ten days of receipt of the agency's final decision. Id. at 8–8(B). Or, if the matter giving rise to an employee's complaint was "not otherwise covered by" the state personnel regulations, the employee could request review of the matter by the state personnel director "within [ten] days after receipt of notice or knowledge of the action." Id. at 8–102.

¶ 15 Under these regulations, Steele had two possible avenues for initiating a review of the agency's reduction of her work time: (1) filing a grievance with Fitzsimons pursuant to Regulation 8–8(A)(2) or (2) seeking review by the state personnel director of a matter "not otherwise covered by" the state personnel rules pursuant to Regulation 8–102(A). For these requests to be timely, Steele needed to file either (or both) of them within ten days of learning that Fitzsimons had reduced her sick hours.

¶ 16 Steele filed her grievance with Fitzsimons twenty-three days after receiving her paycheck for the pay period in which Fitzsimons had reduced her sick hours, the time at which she knew or reasonably should have known about the reduction. Thus, she did not timely initiate review of the reduction under the grievance process. See id. at 8–

8(A)(2). And although Steele subsequently sought the Director's review of her grievance, she did not do so until five months later, long after the expiration of the deadline to initiate the review process by requesting the Director's review. *See id.* at 8102.[2]

¶ 17 Accordingly, we conclude that Steele's request for the Board's or the Director's review of her claim was not, in fact, timely, and, thus, we do not review the merits of her claim on appeal.

¶ 18 In reaching this conclusion, we necessarily reject Steele's argument that her claim should be considered timely asserted because it was impliedly consolidated by the Director with a second, timely filed grievance of hers. Steele has proffered to us neither authority nor a compelling argument why she ought to be able to obtain review by bootstrapping an untimely asserted claim onto a timely asserted one.

¶ 19 Because Steele failed to timely initiate the initial review of her claim, neither Fitzsimons nor the Director erred in denying it. *See Lanphier v. Dep't of Pub. Health & Env't,* 179 P.3d 148, 152 (Colo.App.2007) (where a state employee fails to comply with procedural requirements for the evaluation of the employee's claims, dismissal is proper).

### III. Idowu's and Whitfield's Grievances

¶ 20 Idowu and Whitfield (hereinafter the employees) contend that the Director erroneously applied Regulation 3–34, and that the district court erroneously interpreted section 24–50–104.5(1), to allow Fitzsimons to "cancel" previously approved leave time which had been taken by them. We agree.

¶ 21 On appeal from a district court's review of a final agency action, we apply the same standard of review as the district court. *Schlapp v. Colo. Dep't of Health Care Policy & Fin.,* 2012 COA 105, ¶ 9, 284 P.3d 177; *see also* § 24–4–106(11)(e), C.R.S.2013. Under that standard, a final agency decision may not be reversed unless it is arbitrary and capricious or contrary to

rule or law. § 24–4–106(7), C.R.S.2013; *Chostner v. Colo. Water Quality Control Comm'n,* 2013 COA 111, ¶ 23, 327 P.3d 290. In applying this standard, we presume the validity and regularity of administrative proceedings and resolve all reasonable doubts as to the correctness of administrative rulings in favor of the agency. *Chostner,* ¶ 25 (noting also that the party challenging the agency action has the burden of overcoming this presumption).

¶ 22 Turning to the merits of this appeal, ordinarily we would address the issues in the order in which they were decided, that is whether, in the first instance, Regulation 3–34, or, in the second instance, the text of section 24–50–104.5(1) itself, permitted cancellation of the employees' previously approved leave time. However, because of the inconsistent manner in which the Director and the district court applied section 24–50–104.5(1), we deem it more appropriate to first explore the meaning of the statute itself, and then, if necessary, determine whether the Director could promulgate a rule which would control the outcome of the case.

### A. Interpreting Section 24–50–104.5(1)

¶ 23 Statutory interpretation is a question of law we review de novo. *Town of Telluride v. San Miguel Valley Corp.,* 197 P.3d 261, 262 (Colo.App.2008).

¶ 24 In interpreting a statute, a court must ascertain and give effect to the intent of the General Assembly and refrain from rendering a judgment that is inconsistent with that intent. *Trappers Lake Lodge & Resort, LLC v. Colo. Dep't of Revenue,* 179 P.3d 198, 199 (Colo.App.2007). To determine legislative intent, we look first to the words of the statute. *Id.* We give effect to the common meaning of the words used in the statute. *Bd. of Cnty. Comm'rs v. Roberts,* 159 P.3d 800, 804 (Colo. App.2006). If those words are clear and unambiguous in import, we apply the statute as written. *Trappers Lake Lodge,* 179 P.3d at 199. "If, however, the words are ambiguous or unclear, such that 'the words chosen

**2.** To the extent that Steele argues that the administrator of Fitzsimons "restarted" the filing period in which she could seek the Director's review by reducing her sick hours by an additional hour,

Steele's request for review was still untimely, as it was filed four months after the adjustment was made.

do not inexorably lead to a single result,' we may consider, among other things, the legislative declaration, the object sought to be attained, and the consequences of a particular construction." *Id.* at 199–200 (quoting *State v. Nieto*, 993 P.2d 493, 501 (Colo.2000)).

¶ 25 We presume that the General Assembly intended a just and reasonable result, § 2–4–201(1)(c), C.R.S.2013, while avoiding interpretations that would produce absurd results. *Larrieu v. Best Buy Stores, L.P.,* 2013 CO 38, ¶ 12, 303 P.3d 558.[3]

¶ 26 As noted earlier, the pertinent part of section 24–50–104.5(1) provides:

> Holidays and periods of authorized paid leave·falling within a regularly scheduled workweek shall be counted as work time in determining overtime for employees performing essential ... support services....

¶ 27 The critical term in the statute is the word "authorized." As a verb, the term "authorize" has a plain and ordinary meaning, that is, "[t]o give legal authority; to empower ... [t]o formally approve; [or] to sanction." *Black's Law Dictionary* 153 (9th ed.2009); *see also Webster's Third New Int'l Dictionary* 146 (2002) (to authorize is "to endorse, empower, justify, or permit by or as if by some recognized or proper authority"); *see also In re Hecht*, 213 S.W.3d 547, 567 (Tex. Spec.Ct.Rev.2006) (" 'The primary meaning of 'authorize' is to empower, or give a right to act.' " (quoting *Caller Times Publ'g Co. v. Chandler*, 134 Tex. 1, 130 S.W.2d 853, 856 (1939) (emphasis added))).

¶ 28 To take paid sick or annual leave, an employee must request and obtain approval for such from the employee's supervisor. *See* Dep't of Pers. Reg. 5–1(B), 4 Colo.Code Regs. 801–1 (2012) ("Employees are required to work their established work schedule unless on approved leave. Employees are responsible for requesting leave as far in advance as possible.... Appointing authorities are responsible for approving all leave requests and for determining the type of leave granted.").

¶ 29 Because to·"authorize" is to give permission or approval, and because state employees must seek and obtain approval to take leave, the plain meaning of "authorized" paid leave is time during which an employee has received formal approval empowering him or her to, with pay, be away from work during scheduled work hours.

¶ 30 That much, at least, is clear. What is not clear from the text of the statute is whether, as the district court found, Fitzsimons had the discretion under the statute to essentially "de-authorize" previously authorized leave by cancelling or withdrawing its authorization. The statute is ambiguous on that point.

¶ 31 We acknowledge an agency's discretion to, in the first place, authorize or withhold authorization of paid leave. *See generally Dunklee v. Kettering*, 123 Colo. 43, 46, 225 P.2d 853, 854 (1950) (" 'Ordinarily [authorization] is said to be permissive merely, not being on its face mandatory, but being given its natural significance of a grant of power rather than an imposition of a duty, and implying either a discretionary or permissive power.' " (quoting 7 C.J.S. 1294)). But here, the narrow question is whether an agency has the discretion, under the statute, to withdraw its authorization once an employee has acted in reliance upon that authorization by taking the requested leave. In our view, it does not.

¶ 32 The readily apparent purpose of section 24–50–104.5(1) was to provide a particular type of benefit (overtime compensation) for a particular type of state employee (i.e., one who, because of the nature of his or her job, may have to provide coverage for critical services by working extra shifts or hours in workweeks where he or she has already taken holiday or authorized paid leave). *Cf.* Colo. Dep't of Health & Human Servs. Policy No. VI–2.9, Hours Worked and Overtime Compensation, at 3 (Nov. 14, 2005) ("Essential Employee (for overtime purposes): A non-exempt (eligible for overtime compensation)·employee in positions that require them

---

**3.** We are cognizant of the cases giving deference to an agency's interpretation of a statute or regulation it is charged with administering. *See, e.g., El Paso Cnty. Bd. of Equalization v. Craddock,* 850 P.2d 702, 705 (Colo.1993); *Chostner v. Colo. Water Quality Control Comm'n*, 2013 COA 111, ¶ 24, 327 P.3d 290. But, in this case, the agency did not interpret the statute.

to be on duty to perform the essential and/or emergency services of the department without delay and/or without interruption.").[4]

¶ 33 Indeed, as acknowledged by the Director and the Department of Personnel and Administration in their answer brief, the particular type of employee here (i.e., the "essential" employee) "work[s] in critical state services roles and their work schedules can be unpredictable due to fluctuating staffing needs." By enacting section 24–50–104.5(1), the General Assembly intended to ensure that "essential" employees are appropriately compensated when they have to work beyond forty hours at unexpected or unusual times, even if they did not actually work some of their normally scheduled hours that week.

¶ 34 This intent is confirmed by the legislative history of the statute, which was enacted, in somewhat different form (and under a different section number) in 1994.[5] See § 2–4–203, C.R.S.2013 (in construing an ambiguous statute, a court may consider its legislative history).

¶ 35 The two sponsors of the bill, Senator Thiebaut and Representative George, noted that in 1993 the Director had, by regulation, eliminated the prior practice of counting authorized leave and holidays as work time for purposes of computing overtime compensation. See Hearing on S.B. 94–150 before the S. Comm. on State Affairs, 59th Gen. Assemb., 2d Sess. (Feb. 7, 1994) (testimony of Sen. Bill Thiebaut); Second Reading of S.B. 94–150 before the House, 59th Gen. Assemb., 2d Sess. (May 5, 1994) (testimony of Rep. Russell George).[6]

¶ 36 According to Representative George, the purpose of the 1994 bill was to restore the prior practice of counting authorized leave and holidays toward work time for purposes of computing overtime compensation for "essential" employees. Second Reading of S.B. 94–150 before the House, 59th Gen. Assemb., 2d Sess. (May 5, 1994) (testimony of Rep. Russell George); see also People v. Miller, 97 P.3d 171, 174 (Colo.App. 2003) (according "substantial weight to the sponsors' statements concerning a bill's purpose").

¶ 37 Senator Thiebaut explained that "essential" employees "were to be set apart from other state employees" to receive this benefit because they are sometimes required to work beyond a normally scheduled "forty-hour week," often on weekends, due to the nature of the services they provide. Second Reading of S.B. 94–150 before the Senate, 59th Gen. Assemb., 2d Sess. (Apr. 20, 1994) (testimony of Sen. Bill Thiebaut).

¶ 38 Representative George clarified that essential employees often have to work at times when other employees are not "expected to," including holidays, "for ... extraneous reasons, snowstorms for example, or shortage of personnel, or in the state patrol instances, emergencies and that sort of thing." Hearing on S.B. 94–150 before the H. Comm. on State Affairs, 59th Gen. Assemb., 2d Sess. (Apr. 28, 1994) (testimony of Rep. Russell George). He explained that the Director's 1993 regulation "punish[ed]" these employees for "be[ing] home with [their] famil[ies] or doing what [they] choose to do" with their leave by depriving them of the overtime they would otherwise earn for working at such inconvenient times. Second Reading of S.B. 94–150 before the House, 59th Gen. Assemb., 2d Sess. (May 5, 1994) (testimony of Rep. Russell George). He argued that as an "incentive or reward[ ]" for

---

4. This was the policy in effect at the time the events in this case occurred. Although revised in 2012, the policy still contains a similar definition of "essential employees." See Colo. Dep't of Health & Human Servs. Policy No. VI–2.9, Hours Worked and Overtime Compensation, at 2 (Sept. 1, 2012).

5. As originally enacted, the statute required the Director to adopt "[a] standard that a holiday or period of authorized leave of absence falling within a regularly scheduled workweek is counted as working time in determining overtime work for employees required to perform essential

services...." See Ch. 270, sec. 1, § 24–50143(3)(f), 1994 Colo. Sess. Laws 1589.

The statute was amended to its current form in 1998. See Ch. 194, sec. 2, § 23–50–104.5, 1998 Colo. Sess. Laws 675.

6. The Director had purportedly done so pursuant to her power under Ch. 16, sec. 2, § 24–50–143(3), 1993 Colo. Sess. Laws 36, to "adopt such procedures as may be necessary to insure that the state personnel system is in full compliance with the [Fair Labor Standards Act of 1938]."

working when they would otherwise be "hav[ing] lives outside the job," "essential" employees should be able to have authorized leave and holidays count toward their total work time. *Id.*

■ ¶ 39 The General Assembly's intent is, in our view, best given effect by interpreting the statute as requiring the agency to cancel or withdraw previously authorized leave *before* the employee actually takes the authorized leave. Once the employee has taken the authorized leave, it is too late for the agency to change its mind: The agency cannot, in that situation, alter the "authorized" nature or characterization of the employee's act after the act has occurred.

¶ 40 In this regard, we find instructive the decision of another division of this court in *Mason Jar Restaurant v. Industrial Claim Appeals Office,* 862 P.2d 1026 (Colo.App. 1993), a workers' compensation case. In the worker's compensation setting, once an injured employee's care is no longer reasonably necessary, an "authorized" physician is no longer entitled to payment from the employee's employer for subsequent treatment, meaning that the physician has been "de-authorized." *Id.* at 1027–28. However, in *Mason Jar,* the division concluded that this circumstance would not trigger a "blanket de-authorization and retroactive denial of payment" to all other treatment providers to whom the physician referred the employee: although the authorized physician could no longer receive payment for the care he provided to the employee, his de-authorization "had no effect on [his] status as [the employee]'s authorized treating physician prior to the effective date of the [de-authorization] and therefore, any referrals made by that provider prior to that date were properly authorized." *Id.* at 1029.

¶ 41 Following the logic of *Mason Jar* here, once leave has been authorized and then taken, or taken and then authorized, there is nothing left for the agency to "de-authorize" other than the payment for that leave. And de-authorization of payment, under those circumstances, would undermine

the very purposes for which the statute was enacted.

¶ 42 This interpretation of the statute does not lead to an absurd result. The district court thought otherwise, based on a scenario of an employee taking forty hours of authorized paid leave and then "work[ing] forty hours anyway" during the week. Under our interpretation, however, an agency has the discretion to initially refuse to authorize leave or to cancel any previously authorized leave that has not yet been taken. Thus, if an employee planned to work during normally scheduled shifts for which the employee was going to take paid leave, the agency could cancel the leave before it was actually taken. If, on the other hand, the employee took paid leave for (and was absent from) his or her normally scheduled shifts and then was somehow needed or required to work forty other hours in one workweek, then it would be sensible to pay the employee overtime for working abnormally scheduled hours.

¶ 43 To illustrate this last point, assume that Idowu is normally scheduled to work Monday through Friday. She gets sick on a Tuesday and is approved for and uses eight hours of sick leave. On Saturday, she is called into work for eight hours because the Health Care Tech who is normally scheduled for that shift is sick. Idowu should be able to receive overtime pay for that unexpected Saturday shift, even though she actually worked only forty hours.

¶ 44 Here, by taking their authorized sick leave, the employees relied on (1) Fitzsimons' promise that they would be paid for the time when they were absent from the workplace and (2) the "promise" implied by the language of section 24–50–104.5(1) that they would be paid at an overtime rate for any work time exceeding forty hours in weeks in which they were allowed to take "authorized" leave. *Cf. Dep't of Transp. v. First Place, LLC,* 148 P.3d 261, 266 (Colo.App.2006) ("Promissory estoppel may be asserted against a public entity.").[7]

7. The employees detrimentally relied on these promises by being willing to accept, rather than

decline, additional work outside their

¶ 45 Allowing agencies to, in effect, subsequently "de-authorize" leave taken in reliance on the above-mentioned promises would

- allow them to avoid altogether the prospect of having to pay overtime compensation based, in part, on authorized leave time, in direct contravention of the dictates of the statute; and

- remove any incentive for essential employees to work unexpected shifts after having been sick.

¶ 46 For these reasons, we conclude, contrary to the district court, that Fitzsimons was not empowered under section 24–50–104.5(1) to cancel (or "de-authorize") the previously approved and taken leave time of its "essential" employees. Consequently, any power to cancel or "de-authorize" previously authorized and taken leave time must be found elsewhere.

¶ 47 According to the Director, such power exists in Regulation 334. normal schedules in the expectation that they would receive overtime compensation.

### B. Regulation 3–34

¶ 48 In her decision, the Director did not take issue with the employees' assertion that they had been granted "authorized" paid leave time, for purposes of section 24–50–104.5(1). Rather, she acted based on her perceived authority to promulgate a rule that would effectively override the statute by allowing agencies to "cancel" previously authorized paid leave time. In doing so, she erred.

¶ 49 "Because 'the General Assembly cannot delegate explicitly for every contingency that may arise,' it is well established that 'agencies possess implied and incidental powers filling the interstices between express powers to effectuate their mandates.'" *Colo. Common Cause v. Gessler*, 2012 COA 147, ¶ 17 (quoting *Hawes v. Colo. Div. of Ins.*, 65 P.3d 1008, 1016 (Colo.2003)), *aff'd*, 2014 CO 44, 327 P.3d 232; *see also Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ("If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation."). Accordingly, where the General Assembly lawfully delegates power to an administrative agency, that agency may do "whatever is reasonable, such as promulgating rules, to fulfill its duties." *Colo. Common Cause*, ¶ 17.

¶ 50 Here, the Director perceived that section 24–50–104.5(1) authorized her to "promulgate[ ] rules that provided necessary criteria and processes to administer the statute and applicable federal laws." However, the pertinent portion of section 24–50104.5(1) only authorized her to "establish the general criteria and processes necessary for the state personnel system to fully comply with all applicable *federal employment laws*." (Emphasis added.) It did not provide her with any general authority to promulgate regulations to administer the statute itself. Thus, contrary to the Director's perception, 24–50–104.5(1) does not permit her to enact regulations to "administer the statute" beyond those that ensure that the state personnel system complies with federal employment laws.

¶ 51 The Fair Labor Standards Act (FLSA) of 1938, 29 U.S.C. §§ 201–219 (2012), establishes the minimum wage and hour requirements with which employers must comply. Nothing in the FLSA prevents states from providing employees with additional benefits in these areas. *See Barefield v. Vill. of Winnetka*, 81 F.3d 704, 711 (7th Cir.1996) ("The FLSA sets a floor, not a ceiling, on compensation that employees must receive.")

¶ 52 Under the FLSA, employers must pay employees at an overtime rate for hours actually worked in excess of a forty-hour workweek. See 29 U.S.C. § 207(a)(1) (2012) ("Except as otherwise provided in this section, no employer shall employ any of his employees ... for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."); *cf.* 29 C.F.R. § 778.102 (2013) ("If no more than the maximum number of hours prescribed in the Act are actually worked in the workweek, overtime com-

pensation pursuant to section 7(a) need not be paid.").

¶ 53 Section 24–50–104.5(1), however, provides pay at an overtime rate to essential state employees in instances where they have not actually worked more than forty hours in a workweek. Because the overtime compensation part of section 24–50–104.5(1) exceeds FLSA requirements, the FLSA is not implicated. *See Chavez v. City of Albuquerque,* 630 F.3d 1300, 1310 (10th Cir.2011) (The FLSA purposes of compensating employees "for the strain of working long hours ... is not implicated if the employee does not actually work the requisite number of hours in a week, regardless of whether the employee is compensated as though he or she did work."). Consequently, no rule or regulation with respect to section 24–50104.5(1)'s overtime compensation provision was needed to bring the state personnel system into compliance with applicable federal employment laws. *Cf.* Hearing on S.B. 94–150 before the S. Comm. on State Affairs, 59th Gen. Assemb., 2d Sess. (Feb. 7, 1994) (testimony of Sen. Bill Thiebaut) (stating that the Director's power to ensure compliance with the FLSA was not intended to override the policy of counting authorized leave and holidays as work time in calculating overtime).

¶ 54 Nonetheless, the Director and Fitzsimons argue that the Director's authority to promulgate regulations affecting overtime compensation for "essential" state employees exists by virtue of her authority to oversee the state's "total compensation philosophy" to "provide prevailing total compensation to officers and employees in the state personnel system to ensure the recruitment, motivation, and retention of a qualified and competent work force." § 24–50–104(1)(a)(I), C.R.S. 2013.

¶ 55 As used in section 24–50–104, "'total compensation' includes, but is not limited to, salary, group benefit plans, retirement benefits, merit pay, incentives, premium pay practices, and leave," § 24–50–104(1)(a)(I), and, under that statute, the Director is charged, in pertinent part, with

- "determin[ing] and maintain[ing] salaries, state contributions for group benefit plans, and merit pay that are comparable to public and private employment" based on surveys of other employers, § 24–50–104(1)(a)(II);
- "adopt[ing] appropriate procedures to determine and maintain other elements of total compensation, including the payment of incentive awards," *id.*; and,
- "prescrib[ing] procedures for the types, amounts, and conditions for all leave benefits that are typically consistent with prevailing practices...." § 24–50104(1)(g).

¶ 56 Here, the Director's power to "adopt" or "prescribe" "procedures" for determining and maintaining the "elements of total compensation" or the "types, amounts, and conditions for all leave benefits" is general in nature. As the context makes clear, the Director's power stands alongside—and must be exercised in conjunction with—numerous rules, procedures, and rights that have been defined by the General Assembly. *See, e.g.,* § 24–50104(1)(e) (requiring the state personnel director to "sustain an employee's base salary in the event such employee's position is placed in a lower pay range" due to a variety of circumstances); § 24–50–104(7)(a) ("No employee may retain accumulated sick leave in excess of forty-five days at the end of any fiscal year."); § 24–50104(8)(a) ("Salaries for positions in the state personnel system paid on a monthly basis shall be paid as of the last working day of the month."). Nothing in section 24–50–104 empowers the Director to enact regulations which would permit state agencies to avoid these requirements altogether.

¶ 57 Section 24–50–104.5(1)'s requirement that "authorized paid leave" be counted toward the work time of essential employees is a defined statutory right. Thus, any "appropriate procedures" to determine and maintain overtime pay must necessarily provide that "authorized paid leave" be counted toward the total work time of essential employees.[8]

¶ 58 Because we have discerned no legislative intent to empower the Director, by rule

8. Further, the particular terms used in section 24–50–104 would suggest that any procedures

relating to the "conditions for ... leave benefits" would have to be applied prior to, rather than

or regulation, to "cancel" any statutory benefits conferred by section 24–50–104.5(1), we must conclude that Regulation 3–34 could not be used to such effect. *See* § 24–4–103(4)(b)(IV), (8)(a), C.R.S.2013 (no rule may conflict with other provisions of law, and any rule that conflicts with a statute shall be void); *Colo. Common Cause,* ¶ 18 (agencies may not promulgate rules that modify or contravene statutory or constitutional provisions). Thus, the Director erred in concluding otherwise.

### *IV.  Conclusion*

¶ 59 Fitzsimons had no authority to withdraw or cancel the employees' previously authorized leave time. Consequently, the leave time must be counted towards calculating the employees' right to overtime compensation.

¶ 60 Accordingly, the judgment is reversed, insofar as it concerns Idowu's and Whitfield's complaints, and the matter is remanded to the district court for entry of an order requiring that they be awarded back pay in the amount of overtime they would have received had their periods of authorized paid leave been counted towards the calculation of overtime. The judgment is affirmed, however, insofar as it concerns Steele's grievance.

JUDGE CASEBOLT and JUDGE BERGER concur.

after, the approval (or "authorization") under section 24–50–104.5(1) of paid leave time.